

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-11-00838-CV

**COATES ENERGY TRUST**, Coates Energy Interests, Ltd. and Hager Oil & Gas,
Appellants

v.

**FROST NATIONAL BANK** as Trustee and as Guardian of the Estate of Peter Atchison, and
Falcon International Bank as Trustee,[1]
Appellees

From the 229th Judicial District Court, Duval County, Texas
Trial Court No. DC-08-79
Honorable Alex Gabert, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Catherine Stone, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed:  November 28, 2012

REVERSED AND RENDERED

This case involves a dispute over the type and fraction of interest currently owned by

appellants Coates Energy Trust and Coates Energy Interest, Ltd. (collectively "Coates") and

Hager Oil ("Hager") in minerals underlying several tracts of land in Duval County.  At issue is

whether the Peters, trustors of assets now managed by appellees Frost National Bank and Falcon

---

[1] Falcon International Bank serves as trustee of a testamentary trust created by one of the Peters's children, which has an interest in the minerals through the Peters family trust managed by Frost National Bank.

International Bank (collectively "Frost"), conveyed a 1/16 fixed royalty interest or a 1/2 nonparticipating mineral interest to George Coates, predecessor in interest to Coates.[2] The trial court held Coates and Hager were entitled only to a fixed royalty interest and ordered Coates to pay attorneys' fees to Frost. Because we hold the Peters conveyed a 1/2 nonparticipating mineral interest to Coates, we reverse the trial court's judgment and render judgment in favor of Coates and Hager.

## BACKGROUND

On May 3, 1932, W.R. Peters and his wife, Leila Peters, conveyed to George Coates mineral interests in three 680-acre sections of land covered by three surveys, Surveys 36, 39, and 40.[3] The parties utilized a commercial preprinted multi-clause deed commonly used at the time,[4] containing a granting clause, a "subject-to" clause (related to any existing lease), and a future lease clause. The parties filled in numbers, land descriptions, and other information.

### *May 3, 1932 Peters-Coates "Royalty Contract"*

The "granting clause" conveyed Coates:

> . . . an undivided **one-half** interest in and to all of the oil, gas, and other minerals in and under the following described tract of land, situated in Duval County, Texas, to wit: [**Surveys 36, 39, and 40**] together with the rights of ingress and egress at all times for purposes of taking said minerals.

The subject-to, or existing lease clause provides:

> It is distinctly understood and herein stipulated that if [sic] said land is under an Oil and Gas Lease by grantor providing for a royalty of 1/8th of the oil and certain royalties for gas and other minerals, and that Grantee shall receive **one-half** of the royalties and rentals provided for in said lease; but he shall have **no** part of the annual rentals paid to keep said lease in force until drilling is begun.

---

[2] Coates subsequently conveyed 1/8 interest to Hager.

[3] A few months later, Coates reconveyed his interest in Survey 36 to the Peters.

[4] This conveyance, as well as the Coates-Hager conveyance, were made on identical pre-printed, multi-clause forms entitled "Royalty Contracts." These forms were commonly used at the time and contain language this court has previously construed. *See generally Hausser v. Cuellar*, 345 S.W.3d 462 (Tex. App.—San Antonio 2011, pet. denied); *Hamilton v. Morris Res., Ltd.*, 225 S.W.3d 336 (Tex. App.—San Antonio 2007, pet. denied); *Garza v. Prolithic Energy Co., L.P.*, 195 S.W.3d 137 (Tex. App.—San Antonio 2006, pet. denied).

The future lease clause provides:

> It is further agreed that Grantee shall have **no** interest in any bonus money received by the Grantor in any future lease or leases given on said land, and that it shall **not** be necessary for the Grantee to join in any such lease or leases so made; That Grantee shall receive under such lease or leases **1/16th** part of all oil, gas and other minerals taken and saved under any such lease or leases, and he shall receive the same out of the royalty provided for in such lease or leases, but Grantee shall have no part in the annual rentals paid to keep such lease or leases in force until drilling is begun.

On the same day, the Peters granted additional mineral interests to George Coates, utilizing another pre-printed commercial form, this one bearing the printed title "Mineral Deed and Royalty Transfer." The deed describes seven tracts of land in seven surveys. Aside from an additional interest conveyed in Survey 40, the other six tracts in the Mineral Deed are completely distinct from the lands described in the Peters-Coates Royalty Contract.

### *May 6, 1932 Coates-Hager "Royalty Contract"*

Three days after the Peters-to-Coates conveyances, George Coates conveyed 1/8 interest in Surveys 36, 39, and 40 under the Peters-Coates Royalty Contract to Dilworth Hager.[5] The parties utilized the same form used in the Peters-Coates Royalty Contract. The preprinted clauses of the Coates-Hager Royalty Contract, as filled in by the parties, provide as follows:

> The granting clause grants to Dilworth Hager "an undivided 1/8 interest in and to all of the oil, gas and other minerals in and under [Surveys 36, 39, and 40]."

> The subject-to clause provides that Hager will receive 1/8th of the 1/8th royalty under the existing lease, but no annual rentals.

> The future lease clause provides that Hager will neither receive any bonus from nor be required to join in any such lease, but will receive "1/64th of all oil, gas and other minerals taken and saved under any such lease or leases."

---

[5] In 1933, Hager conveyed 1/4 of his interest in Survey 39 to W.W. Kelly.

### *Historical Treatment of the Interest by the Parties*

For decades following the 1932 conveyances, the interests obtained by Coates and Hager under the Royalty Contracts were recognized as a collective 1/2 nonparticipating mineral interest (that is, 3/8th to Coates and 1/8th to Hager). A number of leases covering the subject properties were executed providing for a royalty greater than 1/8, and numerous division orders were generated and executed recognizing the right of Coates and Hager to participate in a collective 1/2 of such larger lease royalty. For many years, Frost and its predecessors signed off on multiple division orders crediting Coates and Hager proportionately with their respective 3/8 and 1/8 mineral interests.

### *January 1992 Coates Stipulation*

In 1987, Frost Bank, managing assets owned by the Peters, executed a lease to the Hawn Brothers covering Survey 40 and providing for a 1/4 royalty. In 1989, division orders were issued by the lease operator reflecting Coates's royalty interest as 3/64. Coates disputed the interest, claiming it was entitled to participate in the full 1/4 royalty under the lease, proportionate to its retained share of the 1/2 mineral interest received from the Peters.

On January 6, 1992, Black Gold, the Hawn Brothers' lease operator, wrote to Coates stating it was retaining the disputed revenues and would initiate an interpleader action if the dispute was not resolved within thirty days. On January 29, 1992, Coates responded with a letter ("the 1992 Stipulation"), withdrawing its claim for additional royalties and stipulating that the royalty owned by Coates was a "3/64th royalty interest." Although Coates argues this letter related only to the Hawn Brothers lease, Frost argues the 1992 Stipulation interpreted the 1932 conveyance and applied to future leases as well.

*Sanchez Oil and Gas Leases and Underlying Lawsuit*

In 2003 and 2004, Frost Bank signed two oil and gas leases with Sanchez Oil & Gas Corporation, one covering Survey 39 and one covering all of Survey 40 except the southeast quarter, providing for a 1/4 royalty interest. When Sanchez began producing from the leases in 2006, it issued division orders crediting Coates and Hager with interests based on a 1/16 fixed royalty, rather than on an aggregate 1/2 interest of the 1/4 royalty provided for in the leases. Coates disputed the lesser interest.

Frost claimed the deed should be construed to grant only a fixed 1/16 royalty interest in any future leases, and that Coates was bound by the 1992 Stipulation limiting its claim under the 1932 Peters-Coates Royalty Contract to a fixed 1/16 royalty (less any interest conveyed to Hager).

Failing to resolve the issue, Coates sued Frost Bank to affirm its 1/2 mineral ownership interest in the subject lands and to recover unpaid royalties. Frost Bank brought counterclaims, seeking declaratory judgment to construe the parties' rights under the Peters-Coates Royalty Contract and the 1992 Stipulation, and for breach of contract under the 1992 Stipulation. Hager and Falcon intervened. Sanchez retained the disputed royalties, now totaling approximately $2.5 million, pending the outcome of this litigation.

The trial court denied the parties' competing motions for summary judgment, and the case proceeded to a one day bench trial. The trial court allowed the introduction of extrinsic evidence, such as the "1932 Mineral Deed" and the "1992 Stipulation." The trial court held that, as a result of the 1932 Peters-Coates Royalty Contract and the 1992 Stipulation, Coates and Hager collectively own a 1/16th fixed royalty, rather than a collective 1/2 nonparticipating fee mineral interest, and that Coates waived its rights to claim, and is estopped from claiming, any

greater interest due to the 1992 Stipulation. Alternatively, the trial court concluded that if the 1932 conveyances did not reserve the greater interests claimed by Frost, Frost had adversely possessed the disputed interest. Finally, the trial court awarded Frost attorneys' fees against Coates. Coates and Hager timely appealed.

## ANALYSIS

Coates argues the trial court erred in holding the 1932 Peters-Coates Royalty Contract conveyed only a 1/16 fixed royalty interest, as opposed to a 1/2 nonparticipating mineral interest. It also claims the trial court erred in using the 1992 Stipulation to construe the original deed.

### *Standard of Review*

#### *Deed Construction*

A deed is unambiguous when it is so worded that it can be given "a certain or definite legal meaning or interpretation." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The interpretation of an unambiguous deed is a question of law, and this court conducts a de novo review of the trial court's construction. *See Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986); *Hausser v. Cuellar*, 345 S.W.3d 462, 467 (Tex. App.—San Antonio, 2011, pet. denied) (en banc). When conducting a de novo review, we exercise our own judgment and redetermine each issue, according no deference to the trial court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). In construing the meaning of a deed, the primary duty of the court is to ascertain the intent of the parties as provided in the four corners of the document. *Hausser*, 345 S.W.3d at 467 (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)). To determine intent, the court must harmonize all portions of the deed, even if parts of the deed appear inconsistent or contradictory. *Hausser*, 345 S.W.3d at 466 (citing *Luckel*, 819 S.W.2d at 462). The court "must assume the parties to the instrument intended every clause to have some effect; therefore the

language of the deed should be interpreted so that no provision is rendered meaningless." *Hausser*, 345 S.W.3d at 467 (citing *Luckel*, 819 S.W.2d at 461).

*Admission of Extrinsic Evidence*

In reviewing a cause tried before the court, the court of appeals generally assumes the trial court disregarded any incompetent evidence. *Gillespie v. Gillespie*, 644 S.W.2d 449, 450 (Tex. 1982); *Tagle v. Galvan*, 155 S.W.3d 510 (Tex. App.—San Antonio, 2004, no pet.). Thus, the admission of such evidence will generally not require reversal of the judgment when there is competent evidence supporting the trial court's decision. *Gillespie*, 644 S.W.2d at 450. However, this rule does not apply when it is affirmatively shown that the judgment of the trial court was based in whole or in part on inadmissible evidence. *Sparks v. Gandy*, 213 S.W.2d 559, 560 (Tex. App.—Beaumont 1948); *see Dodeka, L.L.C. v. Campos*, No. 04-11-00339-CV, 2012 WL 1522179, at *5 (Tex. App.—San Antonio May 2, 2012) (noting trial court's error in deeming evidence inadmissible caused rendition of improper judgment); *see* TEX. R. APP. P. 44.1(a) (stating trial court judgment may be reversed if trial court error caused the rendition of improper judgment).

To admit and consider extrinsic evidence when construing a deed, a trial court must make a determination that the deed contains an ambiguity. *Rutherford v. Randal*, 593 S.W.2d 949 (Tex. 1980) (noting that absence of ambiguity in mineral deed negates justification for consideration of extrinsic evidence concerning original intent of grantor). This determination is a question of law. *Hausser*, 345 S.W.3d at 466 (citing *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). To make this determination, the trial court must examine the deed as a whole in light of the circumstances present at the time of its execution. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

*Application*

This court has recently grappled with the two issues of mineral conveyances presented in this case: (1) whether the interests conveyed are mineral ownership interests or royalty interests, and (2) reconciliation of deeds containing different fractional interests in the granting, existing, and future lease clauses. *See Hausser*, 345 S.W.3d at 467; *Garza*, 195 S.W.3d at 141.

*Mineral Ownership or Royalty Interest?*

In *Garza*, this court interpreted two separate deeds, a form "Royalty Contract" in favor of J.B. Claypool and a "Mineral Deed" in favor of Homer P. Lee, to determine whether the interests conveyed were mineral or royalty interests. As a threshold matter, the court first recognized that the "Royalty Contract" name appearing in the Claypool form conveyance should not be given controlling effect. *Garza*, 195 S.W.3d at 139 n.1 (citing *Etter v. Texaco, Inc.*, 371 S.W.2d 702, 705 (Tex. Civ. App.—Waco 1963, writ ref'd n.r.e.)). The court next set out the five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress); (2) the right to lease (the executive right); (3) the right to receive bonus payments; (4) the right to receive delay rentals; and (5) the right to receive royalty payments. *Id.* (citing *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986)). The court noted the Texas Supreme Court's holding that "a mineral interest shorn of the executive right and the right to receive delay rentals remains an interest in the mineral fee.'" *Id.* (quoting *Altman*, 712 S.W.2d at 118-19).

The deeds at issue in *Garza*, and the Royalty Contracts in this case, reserved to the grantors at least the second, third, and fourth *Altman* rights—and perhaps, in part, the first. The 1932 Royalty Contracts in this case reserved for the grantors (Peters and Coates, respectively) the right to lease, to receive bonus payments and to receive delay rentals. Following the Texas Supreme Court's holding in *French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795 (Tex. 1995), the

court in *Garza* held that the grantor's reservation of these various attributes would have been redundant if the deeds intended to convey a royalty interest, which would not have carried such rights in the first instance. 195 S.W.3d at 137; *see also Bank One, Tex., Nat'l Assoc. v. Alexander*, 910 S.W.2d 530, 535 (Tex. App.—Austin 1995, writ denied) (finding deed reserved mineral interest because express reservation of first four *Altman* rights would be redundant if deed reserved only a royalty interest, since such rights are not appurtenant to a royalty interest).

The court also recognized that the phrase "in and under"—contained in the granting clause of the *Garza* deeds just as in the Peters-Coates and Coates-Hager Royalty Contracts here—refers to a mineral interest. *See Garza*, 195 S.W.3d at 143 (citing Laura H. Burney, *Interpreting Mineral and Royalty Deeds: The Legacy of the One-Eighth Royalty and Other Stories*, 33 ST. MARY'S L.J. 1, 30-31 (2001)). Thus, the court found the *Garza* deeds conveyed a mineral interest, not a royalty interest. *Garza*, 195 S.W.3d at 142.

Then, in *Hamilton v. Morris Resources, Ltd.*, this court again considered nearly identical form language as in the Royalty Contracts at issue in *Garza* and the instant case, and again found the instruments conveyed a fractional nonparticipating mineral fee interest, not a fixed royalty. 225 S.W.3d 336 (Tex. App.—San Antonio 2007). Referencing the "in and under" language in the granting clause, and citing the opinion in *Garza*, this court construed the original deeds and a correction deed to convey an undivided 1/4 mineral interest. *Id.* at 344. Consistent with the holding in *Garza*, the court rejected the argument that stripping the grantee of delay rentals and bonuses converted the mineral interest into a nonparticipating royalty interest. *Id.* at 345 ("A mineral interest shorn of certain attributes nevertheless remains a mineral interest.") (citing *Altman*, 712 S.W.2d at 118-19); *French*, 896 S.W.2d at 798.

The trial court in the instant case held the Peters-Coates Royalty Contract conveyed to Coates only a 1/16 fixed royalty interest under any future leases. Yet, both the Peters-Coates and Coates-Hager Royalty Contracts bear the mineral ownership hallmarks this court recognized in *Garza* and *Hamilton*: a grant containing the traditional "in, on, and under" language used to create a mineral fee, followed by express reservation of certain mineral attributes (here, rights to lease and receive delay or rental payments). Thus, we hold the 1932 Royalty Contracts in this case conveyed an undivided mineral ownership interest, not a fixed royalty interest.

*Reconciliation of Conflicting Fractions in Granting and Future Lease Clauses*

In *Garza*, we examined a variety of decisions addressing the use of different fractions in the granting and future-lease clauses, but noted that none of them had directly addressed the "problematic conflict between the granting of a mineral interest and a future lease provision appearing to convey a smaller royalty interest." 195 S.W.3d at 144–45 (discussing *Concord Oil Co. v. Pennzoil Exploration & Prod. Co.*, 966 S.W.2d 451 (Tex. 1998); *Luckel v. White*, 819 S.W.2d 459, 461–63 (Tex. 1991); *Garrett v. Dils Co.*, 157 Tex. 92, 299 S.W.2d 904 (1957)).

Acknowledging the reason for the development of the three-grant or multiclause lease form and the typical 1/8th royalty provided in leases at the time the *Garza* conveyances were executed, we reasoned that neither the royalty contract nor the mineral deed contained any language that made it evident that two differing estates were to be conveyed by the use of different fractions in the grant and existing lease clauses. *Id.* at 146. We rejected the grantor's proposed construction that the mineral interests conveyed to grantees in the granting clause were reduced by operation of the future lease clause to the smaller fraction therein when the current lease was executed. *Id.* at 145.

The court harmonized the provisions in a way that the interests set out in the granting clauses entitled the grantees to consistently receive an interest in whatever amount of royalty was paid under the future lease clause. *See id.* at 145. The court concluded that the smaller fraction stated in the modified future lease clause was nothing more than a recognition of what the royalty would be under a future lease providing for the "usual" 1/8th royalty. *See id.* at 146.

Based on this reasoning, we hold the provision in the future lease clause of the Peters-Coates Royalty Contract—providing that Coates shall receive "1/16th part of all oil, gas and other minerals taken and saved under any such lease"—does not limit Coates's granted right to 1/16th of whatever amount of royalty is paid under a future lease. Rather, the 1/16th fraction is simply a recognition of what the royalty would be under a future lease clause providing for the "usual" 1/8th royalty (that is, Coates's 1/2 interest multiplied by a 1/8 royalty). Thus, we hold the Peters-Coates 1932 Royalty Contract conveyed to Coates a 1/2 share in whatever royalty is reserved under future leases (subject to the subsequent conveyance/reduction attributable to Hager).

In *Hausser v. Cuellar*, this court faced a similar problem with conflicting fractions. In *Hausser*, the granting clause of the 1936 deed in question conveyed an undivided 1/2 interest "in and to all of the oil royalty . . ." 345 S.W.3d at 467–68. The existing lease clause stated that the deed conveyed "one-half (1/2) of all the oil [and other] royalty." *Id.* at 468. However, the pertinent part of the future lease clause of the 1936 deed read:

> In the event a future lease or leases are executed . . . then the Grantees shall receive under such future lease or leases one-sixteenth (1/16) part of all oil, gas and other minerals taken and saved . . . under such lease or leases, and shall receive the same out of the royalty therein provided for . . .

*Id.* at 468. The existing lease provided for a 1/8th royalty, and it was undisputed that grantees had received 1/16th of production (1/2 of 1/8th) under the existing lease for years. *Id.* at 465. In

2006, a new lease was executed with a 1/4 royalty. *Id.* Grantors' successors asserted that, pursuant to the terms of the future lease clause, the grantees' royalty should be limited to a fixed 1/16 royalty interest (1/16th of production). *Id.* Grantees' successors argued that pursuant to the granting clause, grantees were entitled to an undivided 1/2 royalty received under the 2006 lease (1/2 of 1/4th, or 1/8th of production). *Id.*

This court, en banc, rejected the grantors' argument that the future lease clause should control the amount of royalty reservation because the 2006 lease was executed after the deed. *Id.* at 469–70. Instead, we held that under a proper analysis, the 1936 deed must be harmonized to give effect to all its provisions by ascertaining the parties' intent from the four corners of the instrument and to determine whether the granting clause or future lease clause controlled the amount of royalty reservation. *Hausser*, 345 S.W.3d at 470 (citing *Garza*, 195 S.W.3d at 146).

After harmonizing all the provisions of the deed, we held the deed conveyed an undivided 1/2 (the grant clause fraction) of the 1/4th royalty (the new lease royalty), or 1/8th of production. *Hausser*, 345 S.W.3d at 470. We reasoned that the 1936 deed involved a single conveyance with fixed rights because the deed did not contain any language suggesting two different estates were conveyed. *Id.*

Thus, as the court noted in *Garza* and *Hausser*, smaller fractions referencing royalties in the future lease clause that are multiples of 1/8 (here, 1/16th in the Peters-Coates Royalty Contract and 1/64th in the Coates-Hager Royalty Contract) do not create a fixed royalty of that size, but simply recognize what the royalty would be under a future lease providing for the typical 1/8th royalty. Based on this court's precedent in reconciling fractions in the granting and future lease clauses, we hold Coates is entitled to an undivided 1/2 nonparticipating mineral

interest "in whatever amount of royalty is paid under the future lease clause," subject to the subsequent conveyance of 1/8 interest attributable to Hager. *See Garza*, 195 S.W.3d at 145.

### *Admission of Extrinsic Evidence*

Coates also argues the court erred in admitting extrinsic evidence to construe the Royalty Contract, including the 1992 Stipulation which allegedly limits Coates's interest to a 1/16 fixed royalty interest.

Here, neither party contends the 1932 Royalty Contracts are ambiguous; in fact, both parties agree the Royalty Contracts are unambiguous, even though they advance conflicting interpretations of the conveyance language. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 589 ("An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract.").[6]

After reviewing the 1932 Royalty Contracts, applying the rules of statutory construction mentioned previously, and using the deed construction this court followed in *Garza*, we hold the 1932 Royalty Contracts are unambiguous, and unequivocally confer a 1/2 mineral ownership interest to Coates, subject to the subsequent conveyance of 1/8 mineral ownership interest to Hager. No extrinsic evidence should have been admitted to construe the Royalty Contracts as such admission violated the Four Corners Rule. *See Hausser*, 345 S.W.3d at 467; *Luckel*, 819 S.W.2d at 461.

### *Waiver and Estoppel*

The trial court also found Coates waived, and was estoped in equity, from claiming a greater interest under the 1932 Royalty Contract than was stipulated in the 1992 Stipulation.

---

[6] We recognize Frost introduced the 1992 Stipulation not only for purposes of construing the 1932 Peters-Coates Royalty Contract, but also alleging a breach of contract claim based on the 1992 Stipulation. The breach of contract claim is not contested in this appeal; therefore, we consider the propriety of admitting the 1992 Stipulation only as it relates to the construction of the 1932 Peters-Coates Royalty Contract.

Because we hold the 1992 Stipulation should not have been used to construe the 1932 deed, we need not reach these issues.

### *Title by Limitations*

#### *Standard of Review*

When the trial court has filed findings of fact and a reporter's record has been filed, a court of appeals reviews the findings for legal and factual insufficiency of the evidence using the same standards applied to jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Monroe v. Monroe*, 358 S.W.3d 711,716 (Tex. App.—San Antonio 2011, pet. denied). The trial court's legal conclusions are reviewed de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

#### *Application*

The trial court alternatively concluded that Frost Bank is entitled to title by limitations to the disputed fractional mineral interest claimed by Coates and Hager. Although this court holds the 1992 Stipulation should not have been used to construe the 1932 Royalty Contracts, we must now determine if the 1992 Stipulation allowed Frost to adversely possess the mineral interest claimed by Coates and Hager and obtain title by limitations.

As a threshold matter, during oral argument, counsel for Frost conceded the 1992 Stipulation did not apply to Hager. Because Frost based its title by limitations claim on this document, we hold the trial court erred in finding Frost was entitled to Hager's fractional mineral interest through title by limitations. We must now analyze whether Frost adversely possessed Coates's mineral interest.

Under sections 16.024 through 16.026 of the Texas Civil Practices & Remedies Code, a party must bring suit to recover real property held by another in peaceable and adverse

possession under title or color of title within three, five, or ten years of the date the cause of action accrues. *See* TEX. CIV. PRAC. & REM. CODE §§ 16.024 (three years), 16.025 (five years), 16.026 (ten years) (West 2002). To establish adverse possession, a party must show "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *Id.* § 16.021(1). "Peaceable possession" is defined as "possession of real property that is continuous and is not interrupted by an adverse suit to recover the property." *Id.* § 16.021(3).

The starting point for adverse possession analysis is an examination of the relationship between Coates and Frost, so that one can determine whether one party's possession was adverse to the other. *See Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 194 (Tex. 2003). Under the 1932 Royalty Contracts, Frost, as trustee of the Peters, and Coates were co-tenants. *See Pagel v. Pumphrey*, 204 S.W.2d 58, 65 (Tex. Civ. App.—San Antonio 1947, writ ref'd n.r.e.) (characterizing owners of undivided mineral interests as co-tenants). To prove adverse possession against a co-tenant, one must prove "ouster"—"unequivocal, unmistakable, and hostile acts the possessor took to disseize other cotenants." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 70 (Tex. 2011) ("[T]he ouster standard that applies to co-tenants differs from the adverse possession requirement courts impose between strangers because cotenants have rights to ownership and use of the property a stranger would not have.").

In concluding the adverse possession statutes applied in this case, the trial court made the following finding of fact:

> From the 1992 Stipulation until the time that Plaintiffs disputed their interest with Sanchez in December of 2006, Frost Bank held the disputed mineral interest in peaceable and adverse possession under title or color of title. That possession has lasted for a period of more than three years, five years, and ten years.

(emphasis added). The trial court clearly relied on the 1992 Stipulation as evidence of the "hostile" act required to put Coates on notice of Frost's attempt to oust Coates from its interest. However, Coates contends the 1992 Stipulation was limited to the property and term covered by the Hawn Brothers lease and cannot be globally applied to the other lands and subsequent leases at issue in this lawsuit.

Even if this court finds the 1992 Stipulation put Coates on notice of Frost's attempt to oust Coates from its interest, the evidence is legally and factually insufficient to support the court's finding that Frost held the disputed interests in peaceable adverse possession for the requisite statutory period. The record contains examples of division orders, signed by Frost Bank before and after 1992, recognizing the greater interest that Coates claims in this lawsuit. For example, Frost paid Coates its alleged 3/8 mineral interest under the J&P lease in 1995, which was executed after the 1992 Stipulation. The evidence in the record does not support a finding that from 1992 to 2006 Frost Bank held the disputed mineral interest in peaceable and adverse possession. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 16.021(3) ("peaceable possession" requires possession that is "continuous and not interrupted . . ."). We hold adverse possession by Frost could not be continuous if Frost recognized different mineral interests for Hager and Coates from time to time.

Furthermore, upon entering into the Sanchez leases, Frost's interest changed. Under Texas law, a mineral lessor retains only "a royalty interest and the possibility of reverter" and "the lessee acquires title to all of the oil and gas in place." *Pool*, 124 S.W.3d at 188. Thus, as the lessor of the Sanchez leases, Frost retained only a royalty interest. A royalty interest, as distinguished from a mineral interest, is a non-possessory interest. *Id.* In order to prove adverse possession, Frost must demonstrate that it was adverse to Coates's undivided mineral interest.

*See id.* 195.  As the holder of only a right of reversion and a royalty interest under the Sanchez leases, Frost had no possessory interest of the mineral fee; it therefore could not have asserted the required possession, and certainly not open and hostile possession, over Coates's mineral interest.  There is no evidence that Frost took actual possession of the minerals by drilling and producing oil and gas.  *Id.* at 193.  Instead, it conveyed the minerals, by an oil and gas lease, to third party oil and gas companies, holding only a non-possessory royalty interest.

Therefore, we hold Frost did not adversely possess Coates's mineral rights in dispute, and therefore was not entitled to title by limitations.

### *Attorneys' Fees*

#### *Standard of Review*

The Declaratory Judgments Act entrusts attorneys' fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law.  *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).  It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, or without regard to guiding legal principles, *e.g., Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997), or to rule without supporting evidence, *e.g. Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).  *Bocquet*, 972 S.W.2d at 21.  Therefore, in reviewing an attorneys' fee award under the Act, this court must determine whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were reasonable and necessary, or when the award was inequitable or unjust.  *Id.*

*Application*

The trial court awarded Frost Bank attorneys' fees totaling $625,138.29 and Falcon Bank attorneys' fees totaling $99,876.25. Coates challenges the trial court's award on three grounds: (1) Frost and Falcon were required to segregate their fee, as mandated by *Gullo Motors*;[7] (2) attorney's fees are not recoverable in a title dispute: and (3) Frost and Falcon were not permitted to seek attorneys' fees for a declaratory judgment where the dispute was already pending before the court.

All of Frost Bank's arguments regarding attorneys' fees would require the 1992 Stipulation be used to construe the original 1932 deed. For example, Frost argues they did not have to segregate recoverable and non-recoverable claims because all of the claims and defenses in this action were inextricably intertwined because the 1992 Stipulation was necessary to construe the 1932 Royalty Contract. Given that this court now holds the 1992 Stipulation was not necessary to interpret the deed, we reverse the trial court's judgment on attorneys' fees and render Frost Bank and Falcon Bank take nothing.

## CONCLUSION

Based on the foregoing, we reverse the trial court's judgment. We render judgment that the 1932 Peters-Coates Royalty Contract entitled appellants Coates Energy Trust and Coates Energy Interests, Ltd. ("Coates") to 1/2 nonparticipating mineral interest in the 680 acres in Surveys 36, 39 and 40 in Duval County, Texas, subject to any subsequent conveyances, and that the 1932 Coates-Hager Royalty Contract entitled appellant Hager Oil & Gas to 1/8 nonparticipating mineral interest in the 680 acres in Surveys 36, 39 and 40, subject to any subsequent conveyances. We also hold Frost did not adversely possess the disputed fractional

---

[7] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006) (requiring party seeking attorneys' fees to segregate fees between recoverable and unrecoverable claims).

nonparticipating mineral rights, and therefore is not entitled to title by limitations. Finally, we reverse the trial court's judgment as to attorneys' fees and render judgment that Frost National Bank and Falcon International Bank take nothing.

Marialyn Barnard, Justice